# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 12-cr-40064-TSH |
| | ) | |
| GEOFFREY PORTWAY | ) | |
| | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States, by and through undersigned counsel, hereby provides its memorandum regarding the sentencing of Defendant Geoffrey Portway, who has pled guilty to solicitation to commit a crime of violence in violation of 18 U.S.C. §373, distribution of child pornography in violation of 18 U.S.C. §2252(a)(2), and possession of child pornography in violation of 18 U.S.C. §2252(a)(4)(B). For the reasons set forth below, the Government requests the imposition of 327 months imprisonment and a lifetime term of supervised release.

## The Instant Offense

The following sets forth the relevant facts of the instant offense as agreed upon by the parties, set forth in the plea agreement, and sworn under oath:

The defendant, **GEOFFREY PORTWAY**, a/k/a, Fat Longpig, was born in Spain and is a citizen of the United Kingdom. At all times relevant to this case, **PORTWAY** was a resident of Worcester, Massachusetts.

As part of a long-term international investigation referred to as Operation HOLITNA, Department of Homeland Security, Homeland Security Investigations (HSI) identified individuals belonging to certain discussion groups focused upon the kidnap, torture, murder and cannibalization of children. Through these discussion groups, these individuals were chatting about such interests while also exchanging images containing child pornography. Among others, HSI learned of an individual identified on-line as "Fat Longpig," who was utilizing Skype, Yahoo and other programs to communicate with other like-minded members of the group, to discuss with them how together they could capture, rape and eat young children, as well as to trade child pornography among them. HSI later

1

identified the person using the name "Fat Longpig," which is a reference to cannibalism, as **GEOFFREY PORTWAY**, who resided in and conducted on-line activities from Worcester, Massachusetts.

On July 27, 2012, HSI agents along with the Massachusetts State Police and the Worcester Police Department executed a federal search warrant at **PORTWAY's** residence in Worcester, Massachusetts, of which he was the sole occupant. Among items seized were various computers and digital devices which contained child pornography or were used to facilitate the collection and distribution of child pornography:

- ASUS Laptop #A9NOA5561602389;
- HP Laptop #CNF717OLC7;
- Maxtor HDD #Y64DFSJE;
- Fujitsu 2.5 HDD; and
- Eight Optical Discs.

These items were each manufactured outside of the District of Massachusetts, thus affecting interstate or foreign commerce.

A forensic examination of **PORTWAY's** computers revealed tens of thousands of images and videos depicting the violent rape and sexual exploitation of children to include images of children engaged in sexually explicit conduct. Additionally, the computer contained thousands of images of the physical assault of children, including photos and videos depicting the rape, bondage, torture, and killing of children, as well as photos of dead and mutilated children and the cannibalism of children. Just a few of the child pornography images recovered are described as follows:

- An approximately eight- to ten-year old male boy laying face down with arms and legs bound together behind him. An adult male is standing over the boy and the adult is inserting his penis into the child's mouth.
- A three- to five-year old male face down on a chair flipped over. The child is bound to the chair over the shoulders and knees. The genitalia is exposed and the anus is spread.
- A prepubescent boy, approximately eight- to ten-years old, is naked and lying on his back with his hands pulling his legs apart. There is an adult male inserting his erect penis into the boy's anus.

The last image is one of several images that **PORTWAY** distributed on June 18, 2011 to another individual from these discussion groups, Walrus.Blackhawk. The individual has since been identified as Richard DATES, who resides in New Mexico and was located there when **PORTWAY** sent these images.

The forensic examination uncovered evidence of over 4,500 trades of child pornography between **PORTWAY** and others. Many of these trades involved **PORTWAY** distributing child pornography to others based on their stated specific preferences, including images and videos appearing to depict dead children and the cannibalism of children. **PORTWAY** distributed child pornography images for the receipt of expectation of receipt of a thing of value,

namely to obtain other child pornography from the individual to which **PORTWAY** was distributing child pornography.

Furthermore, **PORTWAY** engaged in numerous chats with many individuals about a mutual interest in abducting, raping, murdering, and eating children. Many of these conversations were accompanied by the trading of child pornography and other images of children relevant to the subject at hand. These chats also included multiple images of different real children, accompanied by discussions of desires to sexual abuse and murder and cannibalize the children.

Within these chats, **PORTWAY** solicits several people for their help in abducting a child, mainly from Michael ARNETT of Kansas. At least as early as 2010, **PORTWAY** utilized Skype and other programs to communicate with ARNETT. **PORTWAY** and ARNETT traded child pornography and images of injured, mutilated and deceased children while chatting about the sexual abuse, rape, abduction, murder, and cannibalism of children. Over months, **PORTWAY** repeatedly solicited and endeavored to persuade ARNETT to kidnap a child for him, with the intent that ARNETT would do so and **PORTWAY** would ultimately rape, kill and eat that child. These solicitations for help abducting a child included discussing real children, by name and photo, that ARNETT claimed to know and have access. In the chats, **PORTWAY** and ARNETT discuss different ways to kidnap children and the age range **PORTWAY** prefers. During the time that **PORTWAY** was soliciting ARNETT, he had been told that ARNETT had helped others with such requests before and that he had experience with the abduction and sexual abuse of children. ARNETT has since pled guilty to the sexual exploitation of children for the purposes of producing child pornography in violation of 18 U.S.C. § 2251(a).

During the execution of the search warrant at **PORTWAY**'s residence, HSI agents also discovered a locked door in the basement of the residence. Inside the door was a sally port that led to a second door (with a keyed lock). Inside the second door was a dungeon, which was lined with acoustical sound-deadening material and contained a chair, television, and what appeared to be cable access to the internet. Also located in this room were a child-sized homemade coffin (with large speakers covered in wire mesh at one end) with exterior locking devices, a steel cage (approximately 3' wide, 2' high and 4' long) with multiple locking devices, and a steel table top (with steel rings at 6 points, presumably for restraints). Outside these rooms were a cabinet freezer, an upright freezer, disposable scalpels, butchering kits, and castration tools. This dungeon was described in detail by **PORTWAY** in recovered chats as a place he intended to use to keep kidnapped children while he sexually abused them and as a place to eventually murder and cannibalize the children.

On April 23, 2013, Portway pled guilty to solicitation to commit a crime of violence in violation of 18 U.S.C. §373, distribution of child pornography in violation of 18 U.S.C.

§2252(a)(2), and possession of child pornography in violation of 18 U.S.C. §2252(a)(4)(B). Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties entered a plea agreement in which they agreed to a sentencing range of 216 to 327 months imprisonment, lifetime supervised release, a mandatory $300 special assessment, restitution as ordered by this Court, and forfeiture as set forth in the Superseding Information.

## Government's Sentencing Recommendation

The Government avers that a sentence of 327 months imprisonment, lifetime supervised release, a $300 mandatory special assessment, restitution as ordered by the court, and forfeiture as set forth in the Plea Agreement is sufficient but not greater than necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a), given that Portway's preparations show a definite intent to kidnap a child for the purpose of raping, murdering, and consuming him, as well as his repeated activities trading child pornography. This recommendation is consistent with the Plea Agreement tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C).

### A.  The Sentencing Guidelines

The Supreme Court has declared, "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 41 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

The parties have agreed to the pertinent guidelines calculations, per the terms of the plea agreement and the subsequent Presentence Report. Pursuant to U.S.S.G. § 2X1.1, Portway's base offense level for Count One, Solicitation to Commit a Crime of Violence, is derived from the guidelines for the substantive offense of kidnapping plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.

Furthermore, in accordance with U.S.S.G. § 2A4.1(c) the offense level is cross-referenced to U.S.S.G. § 2A1.1 because Portway intended to murder the minor victim. Under U.S.S.G. § 2A1.1, Portway's base offense level is 43. In addition, in accordance with U.S.S.G. § 2X1.1, Portway's offense level is decreased by three levels because the offense was solicitation and Portway had not yet completed all of the acts he believed necessary for successful completion of the substantive offense. Therefore, his adjusted offense level for Solicitation to Commit a Crime of Violence is 40.

The offense levels for Counts Two and Three, distribution and possession of child pornography, are grouped together because the offenses substantially involve the same harm. U.S.S.G. § 3D1.2. Per U.S.S.G. 2G2.2(a), Portway's violations yield a base offense level of 22. They are increased two levels, in accordance with U.S.S.G. § 2G2.2(b)(2), because the offenses involved a minor under 12. Portway's offense level is further increased five levels because the offense involved distribution of child pornography for the receipt or expectation of receipt of something of value. U.S.S.G. § 2G2.2(b)(3). There is an additional four-level increase, under U.S.S.G. § 2G2.2(b)(4), because the offenses involved material that portrayed sadistic or masochistic conduct. And there is another two-level increase because the offenses involved a computer. U.S.S.G. § 2G2.2(b)(6). Finally, as per U.S.S.G. 2G2.2(b)(7), there is another five-level increase because more than 600 images of child pornography were involved. The adjusted total offense level for Counts Two and Three is, therefore, 40.

Count One does not group with Counts Two and Three for the purposes of guidelines calculations, however. U.S.S.G. § 3D1.2. Count One is counted as one unit, per U.S.S.G. § 3D1.4, because it is the highest offense level, and the group pertaining to Counts Two and Three counts as an additional unit because it is equally serious. Therefore, in accordance with

U.S.S.G. § 3D1.3 and § 3D1.4, the total offense level for Count One is increased by two levels for the two additional units resulting from grouping.  Based on Portway's acceptance of personal responsibility for the offenses, the adjusted offense level is reduced by three levels for a final adjusted offense level of 39.  Portway has no known criminal history, therefore he has a criminal history category of I.  The resulting guideline's range is 262 to 327 months.

The maximum sentence for solicitation to commit a crime of violence in violation of 18 U.S.C. §373 is 20 years. The maximum term of imprisonment for distribution of child pornography, in violation of 18 U.S.C. §2252(a)(2), is also 20 years.  Possession of child pornography in violation of 18 U.S.C. §2252(a)(4)(B) carries a maximum sentence of 10 years. According to U.S.S.G. § 5G1.2(d), if the Sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.

### B.  Sentencing Factors under 18 U.S.C. § 3553(a)

The Court's reasoning in determining the correct sentence must be guided by careful consideration of specific, enumerated factors outlined in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 49-50; *United States v. Dixon*, 449 F.3d 194, 204 (1st Cir. 2006).  A "sufficiently compelling" explanation is one that is grounded in the § 3553(a) factors.  *United States v. Merced*, 603 F.3d 204, 213 (3d Cir. 2010).

Thus, the Court is required to consider all the sentencing factors, not just one or two in isolation.  *Id*.  These factors include: (1) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) the nature and circumstances of the offense and the history and characteristics of the

defendant; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  The list of evidence before the Court is inclusive rather than exclusive, as "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

1.  <u>Distribution and Possession of Child Pornography.</u>

In a recent opinion, Federal District Judge John R. Adams cited a quote attributed to Nelson Mandela:  "There can be no keener revelation of a society's soul than the way in which it treats its children."  *United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010).  He continued, "Given the recent statistics surrounding child pornography, we are living in a country that is losing its soul."  *Id.*

a.  Continued Victimization

The seriousness of the distribution and possession of child pornography alone is difficult to overstate.  Collectors of child pornography are members of a community of deviant individuals who revel in watching the sexual abuse of young and vulnerable children.  The fact that the children suffer the sexual abuse in the first place is a horrible reality, but add to that the continued exploitation of such children by persons like the Defendant for his own disturbing

gratification as well as distributing these materials to others and it becomes a never-ending tragedy.

The National Strategy for Child Exploitation Prevention and Interdiction explained how these images continue to victimize the child pornography "stars" depicted in them in their report to Congress in August 2010:

> The children whose abuse is captured in child pornography images suffer not just from the sexual abuse graphically memorialized in the images, but also from a separate victimization, knowing that the images of that abuse are accessible, usually on the Internet, and are traded by other offenders who receive sexual gratification from the children's distress. According to academic researchers, medical professionals, and child pornography victims themselves, knowing that all copies of child pornography images can never be retrieved compounds the victimization. The shame suffered by the children is intensified by the fact that the sexual abuse was captured in images easily available for others to see and re-victimizes the children by using those images for sexual gratification. Unlike children who suffer from abuse without the production of images of that abuse, these children struggle to find closure and may be more prone to feelings of helplessness and lack of control, given that the images cannot be retrieved and are available for others to see in perpetuity. They experience anxiety as a result of the perpetual fear of humiliation that they will be recognized from the images.

Ex. F25 (relevant excerpts) at 9. Congress has found that "where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years...." Child Pornography Prevention Act of 1996 ("CPPA"), Pub.L. 104-208, sec. 121, 110 Stat. 3009-26, reprinted in 18 U.S.C. § 2251 note at 611; *see also* Affidavit of Dr. Sharon W. Cooper, M.D., FAAP (attached at Ex. F26 at 3-8) (detailing the long term impact of child pornography throughout the life of these victims).

In *United States v. Dyer*, the First Circuit acknowledged the above Congressional findings and reiterated that "child pornography victimizes children not only at the time of actual abuse but each time the image is accessed and distributed anew." *United States v. Dyer*, 589

F.3d 520, 526-27 (1st Cir. 2009).  The Third Circuit in *United States v. Goff* similarly denounced procurers of child pornography, stating:

> The simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials.  "The materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation."  ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come.")  Consumers such as [defendant] who "merely" or "passively" receive or possess child pornography directly contribute to this continuing victimization.

*United States v. Goff*, 501 F.3d 250, 259 (3d Cir. 2007) (citations omitted).  Of course, Defendant was not "merely" nor "passively" collecting these images, but rather continued to directly abuse these children by circulating these images to others.

As the above-quoted statements demonstrate, possession and distribution of images depicting a child's traumatic sexual assault(s) is not a victimless crime.  On the contrary, countless young children have been victimized and continue to be victimized because of the desires and actions of people like Portway.  The Fifth Circuit has recognized that trading of child pornography is significantly different from other offenses involving children in that there are "numerous victims in a case like this, not one victim.  Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child."  *United States v. Miller*, 665 F.3d 114, 121 (5th Cir. 2011).  Every year, every month, every day children suffer sexual assaults which are then caught on camera, memorialized, and then produced and traded to feed the desires of collectors of child pornography.  Children who are victims of such sexual assaults may never recover as they are constantly reminded of the tragic sexual assault and must live with the knowledge that thousands, even millions, of people are viewing the worst moment of their lives, not with disgust, but with sexual longing.

But the best explanation of how child pornography continues to impact its victims is found in the words of the victims themselves. As the victim in the 8kids series eloquently stated:

> Each time someone downloads the pictures showing me being raped and abused I picture some pervert enjoying self-gratifying pleasure from my pain. Each victim notification envelope represents someone who either monetarily or sexually profits from me. Each victim notification envelope represents a confirmation that those images of my suffering are still being viewed. How can I escape them? . . . I am constantly victimized, knowing the awful truth that I can never escape these photos or the people that profit from them . . . My abuser stole my childhood and each of these defendants keeps the cycle going by keeping pictures circulating.

Ex. H38 at 1. The victim in the Misty series[1] wrote:

> Every day of my life I live in constant fear that someone will see my pictures and recognize me and that I will be humiliated all over again. It hurts me to know someone is looking at them – at me – when I was just a little girl being abused for the camera. I did not choose to be there, but now I am there forever in pictures that people are using to do sick things. I want it all erased. I want it all stopped. But I am powerless to stop it just like I was powerless to stop my uncle.
>                                         . . .
> It is hard to describe what it feels like to know that at any moment, anywhere, someone is looking at pictures of me as little girl being abused by my uncle and is getting some kind of sick enjoyment from it. It's like I am being abused over and over and over again.

The victim of the Dalmation series, when asked to describe how knowing there are pictures of his suffering on the internet makes him feel, wrote "it makes me feel in bemarressed and I don't like people haveing me on the internet."[2] Ex. H39 at 1. He also heartbreakingly described the psychological or long term effects as "some people don't forget" and said he wants the judge to know he feels "tortured." *Id.* at 2.

---

[1] Portway's vast collection included images from the 8kids, Barracuda, Dalmation, Football, and SpongeB series. See Ex. H32-H36 (sealed, previously provided to probation and included in the PSR). While Portway did not possess images of Misty, her statement illustrates the seriousness of the offense and can provide guidance as to what constitutes just punishment.

[2] Any quotations in this memo, whether victim impact statements, chats, or otherwise, are directly quoted and therefore any errors and foul language are as found in the original form.

The parents of these victims have also witnessed the long-term damage that distribution of pornographic depictions of their children has caused.  One of the parents of a child depicted in the Football Series fears for his son's future, writing:

> I fear now that my child will never be able to put the past behind him.  That his picture will show up somewhere on the internet . . . That he will be on a date with a girl he loves and not be able to behave properly or be able to fully express his love because of the events that occurred when he was between 6 and 8 years old.  I fear that somewhere down the line, his picture will again surface somewhere and force him to deal with this all over again and he won't be able to handle it.

Ex. H41 at 5.  The mother of the children in the 8kids Series echoes that same sentiment:

> Every time that another pervert gets caught with my sons' images, the nightmare occurs all over again, again, and again.  Unfortunately, with this, the healing process will never be complete . . . These pornographic images will always hang over my children's heads and follow them throughout life like a dark cloud.  This nightmare could end if these perverts were to stop sharing these photographs but they do not . . . The more these photographs are disseminated throughout the internet, the greater the chance that my sons friends and acquaintances could find out about their abuse, victimizing my sons over and over again.

Ex. H38 at 3.  The victims of child abuse and those closest to them clearly state that their suffering has not ended just because the physical abuse has.  They will continue to be victims as long as the images that captured their abuse continue to be circulated for other pedophiles' gratification.

### b.  Perpetuating a Market for the Sexual Abuse of Children

Those persons who seek to satisfy their desires through the download and dissemination of child pornography not only keep the industry alive, but their patronage and perpetuation encourages new series and images of child pornography to be produced on a continual basis.  Such patrons and traders of child pornography guarantee that the sexual abuse of children necessary to produce such images will continue if for no other reason than to gratify their own perverse pleasures.  The Fifth Circuit eloquently recognized:

> [I]f a handful of pornographic images taken twenty years ago were sufficient to
> satisfy the perverse desires of those who possess and traffic in child pornography
> we would not have the huge industry that exists internationally today.  No other
> child would be raped or sodomized or otherwise violated to produce pornographic
> images.  Tragically, the reality is that there is a huge demand for 'fresh faces and
> images.'

*Miller*, 665 F.3d at 123; *see also Goff*, 501 F.3d at 259 ("Children are exploited, molested, and

raped for the prurient pleasure of [defendant] and others who support suppliers of child

pornography.").   The National Strategy for Child Exploitation Prevention and Interdiction's

report to Congress describes the cycle of child pornography from production, to consumption, to

increased demand, and back to ever-increasing production to satisfy that demand:

> The expansion of the Internet has led to an explosion in the market for child
> pornography, making it easier to create, access, and distribute these images of
> abuse. . . . The child victims are first sexually assaulted in order to produce the
> vile, and often violent, images.  They are then victimized again when these
> images of their sexual assault are traded over the Internet in massive numbers by
> like-minded people across the globe . . . . This has the effect of eroding the shame
> that typically would accompany this behavior, and desensitizing those involved to
> the physical and psychological damage caused to the children involved.  This self-
> reinforcing cycle is fueling ever greater demand in the market for these images.
> In the world of child pornography, this demand drives supply.  The individual
> collector who methodically gathers one image after another has the effect of
> validating the production of the image, which leads only to more production.
> Because the Internet has blurred traditional notions of jurisdiction and
> sovereignty, this urgent crime problem is truly global in scope, and requires a
> coordinated national and international response.

Ex. F25 at 2-3.  Each time a viewer of child pornography trades another image depicting the

sexual abuse of children, he is directly contributing to the availability of those images, others like

them, and inevitably the new images which will be produced to satisfy the growing demand.

Thus Portway, who actively distributed child pornography in a *quid pro quo* arrangement with

other like-minded individuals, actively contributed to the victimization of children and continues

to victimize them, even after incarceration, as those images continue to be traded and thereby

perpetuate this horrific market.

c.   Risk of Contact Offenses

Persons who download and view images of the sexual exploitation of children are not just harmless, lost souls hiding in homes and basements.  Rather, researchers Seto, Cantor, and Blanchard found that collectors of child pornography were 2.8 times more likely to be pedophiles than other offenders against children.   Seto, Cantor, & Blanchard, "Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia" Journal of Abnormal Psychology, 2006, Vol. 115, No. 3, pp. 610–615.  They wrote:

> Our results indicate that child pornography offending is a valid diagnostic indicator of pedophilia.  Child pornography offenders were significantly more likely to show a pedophilic pattern of sexual arousal during phallometric testing than were comparison groups of offenders against adults or general sexology patients.  In fact, child pornography offenders, regardless of whether they had a history of sexual offenses against child victims, were more likely to show a pedophilic pattern of sexual arousal than were a combined group of offenders against children.

Ex. F27 at 613. This research merely confirms the common sense notion that someone who collects pictures and videos of children engaged in sexual activity is likely to be sexually aroused by such images.   Thus, defendants such as Portway who collect child pornography are significantly more likely to act upon these victims than other members of society.

Possession of child pornography may be indicative of even more serious crimes.  While it is not uncommon for those convicted for possession of child pornography to have little or no criminal history, this should not detract from the seriousness of the offense, in fact, it should raise even more concern.  Seto, Hanson & Babchisinm authored a study,  "Contact Sexual Offending by Men With Online Sexual Offenses," Sexual Abuse: A Journal of Research and Treatment 23(1), 124-145, December 2010, in which they conducted a meta-analysis of 24 other studies of online sexual offenders.  They found that if the only indicator one relied upon was arrests or convictions, the number of these men who were involved in contact offenses with

children was low, generally less than 20%. But when studies used polygraph testing or some other means to insure honest self-reporting (such as anonymity or immunity from prosecution as part of a treatment program), the numbers were radically different. The studies with these types of validation determined that <u>fifty-five percent</u> of the men (whose only charged offense was the receipt and possession of child pornography) admitted to contact offenses against children. (Attached Ex. F28) The Seto study was based upon many studies, but its results have been confirmed by other, independent studies, as well. For example, in Buschman, Wilcox, Krapohl, Oelrich, & Hackett's, "Cybersex Offender Risk Assessment. An Explorative Study," Journal of Sexual Aggression, July 2010, Vol. 16, No.2, pp. 197-209, a study was done on those whose only offense was possession of child pornography. Fifty-five percent of the subjects in that study, when polygraphed, also admitted to contact offenses with children. Therefore, over half of offenders convicted of possessing child pornography may have already acted on their urges and committed a contact offense against a minor. The fact that a substantial number of "mere possessors" are also contact offenders highlights the seriousness of the crime and supports a higher sentence. What may frighten observers is that such offenders were not arrested, much less convicted, for their self-reported contact offenses in these studies. Just because such an offender does not have a contact offense on his criminal record, it does not mean it does not exist, or that it will not in the future.[3]

In protecting the public, the Court must also consider the potential risk of recidivism by Defendant. While Portway has not previously been convicted of an offense involving contact with a minor, this is not uncommon among collectors of child pornography. Although it is

---

[3] Unlike many other offenders, child molesters do not boast about their crimes. Additionally, victims of sex crimes, in general, are reluctant to report such crimes. Children are, not surprisingly, particularly reluctant to talk about sexual abuse. Bonta & Hanson, "Gauging the Risk for Violence: Measurement, Impact and Strategies for Change" (1994) (published by the Solicitor General of Canada, Ministry Secretariat (Ottawa)); Hanson & Bussière, "Predictors of Sexual Offender Recidivism" (1996) (published by the Solicitor General of Canada, Ministry Secretariat (Ottawa)).

sometimes argued that online offenders have a low rate of recidivism, this is misleading as such recidivism is defined in terms of subsequent arrests and therefore low recidivism numbers are to be expected. As discussed above, conviction rates do not accurately reflect the extent to which these crimes are occurring in our communities. In a more recent article, Ecke, Seto, and Williams, *Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-up Study*, Law and Human Behavior (2011), 466-478, the authors commented:

> Historical cases of sexual contact offenses, especially those committed by child pornography offenders who appeared to have no prior criminal history, may provide a window into undetected sexual offending; offenses that were not (at the time) reported to police or documented in file information. As we previously mentioned, 12% of child pornography offenders in the meta-analysis by Seto et al. (in press) had an official record of prior contact sexual offenses, but half of the child pornography offenders in the smaller subset of studies with self-report information admitted having sexual contacts with children.

Ex. F29 at 476. The authors further observed that while recidivism rates (*i.e.* rearrest rates) were low, they increased over time. Seto and Ecke had done a study in 2005 on this question. The 2011 article was a follow up to that research. The original study followed offenders for an average period of 2.5 years. The new study extended that to 5.9 years. The continued monitoring of these defendants produced a disturbing trend that showed an increase in recidivism the longer an offender was monitored. There was a 6.0% recidivism rate for any child pornography offense during the first 2.5 years of release, but a 9.5% rate during the first 5.9 years. Thus, it seems that the longer an offender is in the community, the greater the likelihood that he will be caught reoffending. Judge Posner, manifestly aware of these studies, recently cited Hanson, Morton and & Harris when he wrote, "Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children." *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) (citing R. Karl Hanson,

Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1)).

d.  Portway's Specific Collection

As evidenced above, the trading of child pornography is an incredibly serious offense, but Portway is a particularly grave offender as judged by the time he invested, the number of images he had, his prolific activity in trading them, and the content of his collection.  Portway has admitted to possessing over 20,000 images and videos of child pornography, a 30-fold increase over the number required for the 5-level guidelines enhancement he has earned.  Ex. E24 at 1.  It can be difficult to put such a large number in perspective but if he spent just ten seconds looking at each image, it would have taken more than 55 hours to view them all. Indeed, Portway has spent substantial time and effort amassing his illicit collection of child sexual abuse images.  Indeed, the digital devices recovered during the execution of the search warrant reveal that Portway has been collecting child pornography since at least 2007.

Each of those is not just an image or video, however, but rather also a child (or children) being abused.  If each picture depicted just one child, those children would fill every seat in the TD Garden.  The National Center for Missing and Exploited Children (NCMEC) serves as a central repository of all child pornography images and prepares a report for each offender about the content of their collection.  Having reviewed the more than 20,000 images in Portway's collection, NCMEC reports that only 388 of those images had been seen before. Ex. E24 at 3. Those 388 images depict 124 children, but only 68 of those children have been identified.  *Id.* at 4.  The overwhelming majority of the children who suffered to create the terrible images that Portway enjoyed have never been identified, much less rescued.

Of course, Portway did not simply collect those images, but rather he also participated in over 4,500 transfers of child pornography files, though the guidelines treat him no differently than an offender who committed only one trade. Ex. E24 at 2. Assuming normal trading activity, each of the people to whom Portway distributed child pornography have since passed those images on as well, and so Portway's trading activity could very well be exponential and unending. Regardless, Portway's extensive collecting and trading activities made him a substantial and active participant that significantly contributed to the online market for child pornography.

Even more concerning is the content of Portway's collection, which was not limited to the sexual exploitation of children commonly seen in child pornography cases. Portway certainly had those images, depicting the graphic sexual assault and penetration of children, which he referred to as "HC" for hardcore. *See* Ex. D19 (sealed, to be provided at sentencing) and E23 (Portway's file structure on three devices). But Portway's collection was far more disturbing, if that is even possible, as his collection also included the sadomasochistic images of children being bound and raped, cooked, killed, mutilated and prepared to be eaten. *See e.g.,* Ex. D20-21 (sealed, to be provided at sentencing). Portway's highly organized collection of child pornography reads as a macabre listing of Portway's sexual interest in the destruction of children, including children "bound," "cleaning," "cookingmanip[ulation]," "eating," "hanging," and "meat," among others. Ex. E23. These files detail each step of a terrible plan. Given the common sense notion, as set forth above, that a pedophiles' image collection depicts that which they find stimulating or desirable, Portway's collection is truly chilling and demonstrates a real risk based upon which the Court should sentence Portway to a substantial term of years in order to protect the public.

2.    <u>Solicitation to Commit a Crime of Violence</u>

Portway's possession and distribution of child pornography is only one component of the offenses for which the Court must sentence him. Portway has also pled guilty to the offense of solicitation to commit a crime of violence, in violation of 18 U.S.C. § 373. The name of this offense somewhat obscures the nature of Portway's intent. To be clear, Portway intended to kidnap, rape, kill, and consume a child and solicited others to assist him in this endeavor.

a.    Portway's Interest in Child Cannibalism

For years leading up to his arrest in 2012, Portway openly, repeatedly and extensively discussed his interest in the complete desecration of a child in chats he had with other child predators. Attached to this memorandum are only a few samples of unending chats between Portway and other like-minded individuals, showing Portway's clear intent in gruesome and disturbing detail, including chats regarding Portway's interest in:

- Trading images depicting the sexual abuse of children, Ex. B4;
- Exploiting children to produce new images of child pornography, Ex. B7;
- Extended and tortured sexual abuse of a child for weeks and/or months, Ex. B14;
- Raping and murdering children, Ex. B6; and
- Cannibalism of children, Ex. B3.

To give just a few, short examples of the thousands of lines of chats, Portway states:

- "I would want to keep [a young boy] for a few weeks/months and fuck him and fatten him up." Ex. B12 at 1.
- "Nice. Would love a nice young boy to fuck and eat." Ex. B4 at 1.
- "I sooooo want to fatten, fuck, kill cook and eat a boy." B1 at 3.

Portway's chats demonstrate no end to his depravity. In response to a suggestion of cooking a child alive, Portway responded "I would love to do that. Everyone says it would waste meat though. Spoil it. But it would make a FANTASTIC video." Ex. B12 at 2 (emphasis in the original). In response to a question about how he would cook a child, Portway's response was he "would gut him. Butcher him. Belly cooked as bacon. (with hand and foot still attached) cock

18

and balls for appetizers." Ex. B1 at 1. Concerned that the "meat" would be tainted in older boys, Portway tells one chat partner "the younger the better." Ex. B10 at 1. In fact, Portway professes that "I have no minimum age. I would eat a newborn." Ex. B1 at 2.

                b.  Planning With and Soliciting Others

Through chats, Portway identifies and solicits other like-minded individuals to assist him in his plans. *See e.g.,* Ex. B10. One such individual, Ronald Brown, used the screen name of uelime. Brown gained access to children through volunteering at his church as a puppeteer and obsessed over certain boys that were taking classes from him. Portway and Brown engaged in detailed planning about the rape, murder and mutilation of these boys, two in particular, such as in this chat from April 2, 2011:

| | |
|---|---|
| Brown: | [Minor-1], age 10? |
| Portway : | maybe. You said you did not have a quite place to keep him. So if he is unrurly and prepared to yell. That will be it. Much better if we enjoyed him in a secure location. But that required money. A rented house away from neighbors |
| Brown: | yea, i don't really have a good place to hold him right now. |
| Portway: | As i said, money |
| Brown: | yes. But you would also have to be careful not a leave a mess. So keeping him quiet would only be |
| Portway: | yup |
| Brown: | Maybe put down a lot of plastic to do him on. |
| Portway: | that could work |
| Brown: | then it would just be rolled up and burned |
| Portway: | yup |
| Brown: | and his remains would have to be destroyed too. |
| Portway: | Yup. or fed to alligators. |
| Brown: | yes, that would work. If we could go to the everglades, it would help in a number of ways. Seclusion, quiet area to work, and gators to eat the leftovers. |

| | |
|---|---|
| Portway: | Yup. but not as secure. |
| Brown: | why not as secure? |
| Portway: | no roof. no walls. visibility is there. |
| Brown: | oh, well i was thinking of getting a place there to rent. |
| Portway: | oh ok |
| Brown : | Not doing him in the open. But even then, we couldn't let anyone see us take him in. |
| Portway: | so we need to rent a van too. |
| Brown: | I have a van. Just bind and gag him and cover him in the back. |
| Portway: | nice |
| Brown: | I would cover the back floor in plastic to provide protection in case he pees or something. |
| Portway: | good idea |
| Brown: | he would still have his clothes on as we ride down I guess. But you could keep an eye on him and play with him some. |
| Portway: | That would be great |

Ex. B5.  Brown and Portway discuss the rape, torture and murder of Minor-1 on many other occasions, including their desire to consume him over a period of weeks.  *See e.g.,* Ex. B14 at 3. Brown even disseminated photos of this child to Portway and others, Ex. C15 (sealed, to be provided at sentencing), including one disturbing photo of this child with lines drawn upon him to identify the different cuts of meat, including the "butt steaks" and "penis-little sausage."  Ex. C15 at 5 (sealed, to be provided at sentencing).

In another chat dated September 15, 2011, Portway and Brown lust over Minor-2 in a hospital bed, while the boy is obviously recovering from extensive surgery:

| | |
|---|---|
| Brown: | I know that 12 year old [Minor-2] could have provided a few bites. I saw him. |
| Portway: | yumm |
| Brown: | He looked good. I think a boy from 10 to 12 would provide well. |

Portway:      lots of meat.  little cock and balls.

Brown:        [Minor-2]? His cock was nice size, though hairless. He did have some fine meat.

Portway:      pity you could't get pics

Brown:        I did get one of him in the hospital showing his chest, but no, none of his genitals.

Portway:      really?  chest is good

Brown:        Nice chest, he is in the bed.

Portway:      send please

***

Portway:      good

Brown:        Nice chest.

Brown:        Would love to have cut into it and crave out some flesh.

Portway:      me too

Portway:      he did look so delicious

Brown:        And nude under that sheet.

Brown:        Too bad I couldn't get a full shot.

Portway:      yumm

***

Portway:      just need to open a mortuary.  any boy who is scheduled to be cremated, dissapears.  fake ashes given.

Brown:        Thats true. No one would know. If [Minor-2] was to have been cremated, he could have been eaten easily.

Portway:      yumm

Brown:        Just place him on the table and start cutting. Extra hot would have been that I knew him.

Portway:      yumm

Brown:        I would have wanted some butt steaks.

Portway:       but you would have preferred the cock and balls

Brown:        I wanted his cock and balls when I used to see alive - so yes, I would have taken those. I could have had the last laugh, I guess.

21

| Portway: | you still can.  he is dead.  all you have to do is laugh now.  he can't laugh afterwards. |
|---|---|
| Brown: | Thats true. I can look at his pictures, like the one of him in the hospital and think of his death. |

The photo traded between them, Ex. C16 at 5, is but one of many photos traded of Minor-2, *see* Ex. C16 (sealed, to be provided at sentencing), and other children, Ex. C15 & C17.  Ronald Brown ultimately pled guilty to possession and receiving child pornography and was sentenced to 20 years' incarceration.  Ex. G34.

Among those he communicated with about their shared interests in child cannibalism, Portway sought out and later found a mentor who could teach him what he needed to do to be successful.  Specifically, Portway communicated with Michael Arnett, whom Portway believed had kidnapped and abused children and had helped others kidnap children.  *See, e.g.,* Ex. B9. Portway sought advice and assistance from Arnett, fueled by Arnett's sharing of stories of his purported exploits and expertise with Portway.  *Id.* at 4-6.  For example, Arnett told Portway that he had recently killed and eaten a 6 year old boy and helped a friend with a 10 month old girl. *Id.* at 4.  Arnett asked Portway what kind of help he would want and Portway asks for help in finding, hunting, and capturing "it," referring to a child.  *Id.* at 1.  Several times Portway and Arnett discuss whether specific children would be appropriate or available for Portway's taste. *Id.* at 1, 2.  Portway asks for Arnett's help in capturing children whose picture Arnett has shown him, which Arnett deflects by claiming they were unavailable.  *Id.* at 1-2.  Arnett does "help" Portway, however, by discussing considerations that Portway would have to take into account to carry out his fantasy.  *Id.* at 2-3.  Arnett and Portway discuss the necessity of traveling to kidnap children, the age at which children are most vulnerable, and the mechanics of butchering and cooking children.  *Id.* They also discuss Arnett's would-be exploits, with Arnett bragging and

Portway admiring the way Arnett purportedly kidnapped and ate children, such as this typical discussion between them:

| Portway: | he looks delicious |
| Arnett: | he didn't know when that picture was taken that he had less than a day to be a little boy. then he was to become just meat |
| Portway: | :) so nice |
| Arnett: | a nice plump slab of toddler meat ripe for butchering, cooking and eating |
| Portway: | I would have loved to eat him. I just can't get a boy |

Ex. B9 at 4 (chat dated February 19, 2011). Arnett and another individual, Robert Poe, gained access to children through babysitting and volunteering with the Children's Mercy Hospital in Kansas City where terminally ill children were treated. Ex. G32 (sealed plea agreement) & G33 (statement of facts entitled "Counts I and II"). While there is no evidence (other than these chats) that Michael Arnett actually kidnapped or cannibalized a child, Arnett and Poe did sexually abuse several children. Ex. G31 (chart detailing their victims; sealed, to be produced at sentencing). Furthermore, Arnett produced a series of child pornography that depicted a child in his care, under two years of age, being placed in a roasting pan and ultimately shut into an oven. Ex. D20 (sealed, to be provided at sentencing). These photos were recovered from Portway's computer. Portway repeatedly asked Arnett to help him by kidnapping a child for Portway to rape, murder and cannibalize, and as far as Portway knew, Arnett had done so previously and was entirely capable of doing so. Arnett ultimately plead guilty to producing, possessing, and distributing child pornography and was sentenced to 30 years in prison. Ex. G32 (J&C).

The chats also make clear that Portway was part of a network of individuals dedicated to the grim purpose of raping, killing and eating a child, many of whom are now charged and/or

convicted. Ex. G30-G37. But these are only a sample of the scores of individuals that engaged in chats with this network. The investigation into other such individuals continues.

c.  Targeting Known Children

Possibly more alarming, Portway, Arnett, and Brown targeted actual children known to them as potential victims, such as Minor-1, Minor-2, and Minor-3 discussed above. The profound impact of their plans is best described by the mother of Minor-1, who wrote a poignant victim impact statement at the time of Brown's sentencing.[4]  *See* Ex. H43 (sealed, provided contemporaneously in hard copy). Her letter makes clear the terrible blow they experienced upon learning about their plans for their son:

> My initial response, after hitting my knees and thanking God for his faithfulness and mercy in keeping my son safe, was one of fear and disgust. A mother is quick to play over in her mind what could have happened. … Many nights I would wake up from a nightmare with a strong need to check to be sure my son really was sleeping peacefully in his bed—feeling so grateful that he was and at the same time feeling profound sadness and empathy for all of the parents whose children weren't.

That was only the beginning of what Minor-1's parents had to endure:

> The next emotion that came was anger. Pure rage like I have never experienced in my life. Of course, there was anger at Mr. Brown. How could another person let himself get so caught up in sin that he would let his mind even think thoughts so disturbing? How could a person know so much about the love of God and yet fantasize about things so evil? Still to this day, my mind can't understand or even fathom how that is even possible. My anger at Mr. Brown was justified and expected. But what really surprised me was the anger I felt toward myself. How in the world could I not have known? I'm the mom. Moms are supposed to know when their children are in danger. Moms are supposed to protect them from bad people.

Worse, this is not over for them, because of Portway and others like him:

> To this day, almost a year after Mr. Brown was arrested and jailed; I have a very difficult time letting my son out of my sight. At 13 years old, a boy wants the freedom to explore his neighborhood on a skateboard, hang out with his friends at

---

[4]  The parents of Minor-1 have indicated that they would like the Court to equally consider this victim impact statement in its sentencing of Portway.

church, go to the corner store for candy and a soda or sleep over at a friend's house. As your kids get older, the natural progression of things is to give them more freedom—to allow them to separate from you and to leave them alone more. I try to allow my son to do those normal things but it is very difficult for me because I don't trust anyone anymore. Anytime he is gone, I battle thoughts about what could have happened to him. Thoughts of whether, even today, he is safe. I think often about who else Mr. Brown might have had contact with via his internet chats. Yes, Mr. Brown is in jail, but before he was caught, he shared my son's picture with his conspirators via the internet. So, I ask myself daily, who else knows my son's face? Who else knows his name? Who else knows where we attend church? Who else knows were we live? Who else is not in jail but lurking and planning to harm my son? Not allowing these thoughts to take over my mind is one of the biggest challenges in my life right now. If I, his mom couldn't see the kind of danger he was in, how could I expect anyone else to know the potential risk to his safety.

Portway did not limit his interest to those children familiar to others, however. Rather, he repeatedly contemplated kidnapping and consuming two children from his own extended family, referred to herein as Minor-4 and Minor-5. Ex. B11, C17. In response to a question about whether kidnapping these children (aged 5 and 3 at that time) would be possible, Portway responded, "if they thought it was a joke or a game, yes. get that one when their parents were not around. Bring them home. Then they would know I was serious when I undressed them. would stop being a game for them." Ex. B11 at 1. While chatting with "Walrus Blackhawk," now charged as Richard Dates, Portway describes Minor-4 as "6. perfect age. nice plump belly. would be delicious." Ex. B11 at 3. Even in a chat where Portway professes to love Minor-4, Portway says "well, he would be dead when he cooks. I love him too much to cook him alive." Ex. B11 at 4. Portway actually laments that his sibling, the parent of those children, doesn't like him or particularly trust him with them. Ex. B11 at 3.

d.  Portway's Dungeon and His Intent to Carry Through

Portway may try to argue that the pictures and chats are just part of a fantasy life and that he never intended to carry out his plans, but the evidence clearly shows that is untrue. In the chats, Portway becomes tired of people engaged in role play or fantasy, telling no less than 15 chat partners he is serious about wanting to kill and eat a child. *See e.g.,* Ex. B12.  For example, Portway told Dates, "I want to actually cook and eat boys. and fuck and fatten them first."  Ex. B12 at 1.  When another user told Portway he was only interested in role playing, Portway responded "drat. I am looking for real."  Ex. B12 at 1. He tells yet another that "I am more into real than roleplay. would love to eat a nice young boy or five. :)" Ex. B12 at 3. Portway tells another "If only there were other real cannibals out there. :)" Ex. B10 at 2. He tells another that "I would really eat a young boy. Or twenty young boys. I am greedy."  Ex. B10 at 3.  Clearly, Portway sees that there are others engaged in fantasy but sees himself as one of a select few who would actually commit cannibalism.

There can be no better evidence of Portway's intent to carry through with his plans than the elaborate dungeon constructed in his home, at significant cost and effort.  Ex. A2 (photos from search warrant of Portway's home).  As described in the statement of facts, the dungeon was built with a sally port, which helped ensure victims could not escape while Portway was entering or exiting the dungeon.  Inside, there was a chair, TV with cable service and various media glorifying cannibalism.  Ex. A2 at 14.  Portway installed foam materials on the walls and ceiling to soundproof the dungeon, which would obviously mute any screams or cries for help. *Id.* at 15-17.  Within the dungeon was a small cage, with a hole in the bars on one side that would allow for a small person to stick their head out. *Id.* at 23-24.  Portway discusses in one chat how the intent of the hole was to provide a way for his victim to eat while he was still caged.  Ex. B8

at 1.  On top of that cage was a heavily scored steel table with 6 separate metal loops that could

be used to restrain a person.  Ex. A2 at 15-17.  Portway also had a small coffin in the dungeon,

with stereo speakers placed inside and an exterior lock on it.  Ex. A2 at 19.  Beyond the dungeon,

Portway had the necessary tools to restrain and kill a child and prepare that child to be eaten,

including straps and handcuffs, work gloves, a castration tool, disposable scalpels, and a

butcher's knife set.  Ex. A2 at 1-2, 12, 20-23, and 25-30.  Portway also had a large "cabinet"

freezer and a refrigerator located next to the dungeon in the basement, far from the kitchen area.

Ex. A2 at 7-8.  He explicitly told another that the appliances were there to store "meat" after

butchering.  Ex. B8 at 8-9.  Finally, Clorox and various other items that could be used to remove

evidence of what Portway had done were present.  Ex. A2 at 4.

### e.  Portway's Attempts to Evade Law Enforcement

Equally telling of Portway's intent to carry through on his plans to rape, murder and

consume a child is the lengths he went to to ensure that there would be no evidence of his

offenses.  Even when chatting with a person who (strangely) expressed a willingness to be his

victim, Portway was very careful to ensure that there would be no way for him to be caught:

> to start with, you leave a note for your friends and family saying you are running
> away/leaving forever. you travel only with cash, and without any electronic devices like
> cell phones, or computers. you bring with you the hard drive of every computer you have
> ever chatted with. you then take a train and then a bus to MASS. knowing that you are
> not going to survive the experience you go to the pre-arranged place at the pre-arranged
> time. and when I drive up, you get into the back seat of my car. you sit there quietly for
> the entire ride back to my place.

Ex. B13 at 1 (chat dated May 27, 2012).  In a chat with another would be victim, who was

seeking reassurances that Portway was capable of successfully butchering him, Portway says that

he would never admit having carried out his fantasy.  Ex. B13 at 1.  Portway explained  "you

could be a cop. any admission here could be used in court."  *Id.*  But Portway then insists that he

will not back out of the arrangement or stop in the middle. *Id.* Finally, when another would be victim asks why Portway won't come to him, Portway discusses his fears of being traced through gas purchases, public and private cameras, and hotel stays. *Id.* at 2. Portway also worries about drawing the attention of police if he slept in his car, which he claims to know from firsthand experience. *Id.*

Despite the detailed planning done with Brown, Portway made clear that he would not carry through with these plans with him, solely because they had communicated in ways that Portway viewed as unsecure for the purposes of evading law enforcement. For example, in a chat dated June 23, 2012 (roughly one month before Portway's arrest), he instructs:

| | |
|---|---|
| Brown: | He won't be untied until he is dead. |
| Portway: | but then you won't know what to do with him, because you don't like blood. |
| Brown: | I guess I was always hoping that you might help with that. |
| Portway: | not likely at this point. you made that decision long ago |
| Brown: | I did? |
| Portway: | yes. many many times. I told you I only talk on skype. you insisted on chatting here [on Yahoo]. I told you many times. |
| Portway: | here is roleplay |
| Brown: | Well, I can get Skype this afternoon. I just haven't bothered to get it yet. |
| Portway: | Years too late at this point |
| Brown: | I had it on the other computer but it was hardly ever used and I never put it on this one. |
| Brown: | Do you chat with others on Skype? |
| Portway: | sorry, was in bathroom. yes, I chat with others on skype. |
| Brown: | Well, I will have to see about getting that. It was just hardly ever used before. |
| Portway: | well, it doesn't really matter anymore. |
| Brown: | You might loosen up a little more over there. |

> Portway:    nope.  :)
>
> Brown:    Are the ones that you chat with those who share our interest?
>
> Portway:    yes

Simply put, Portway's concerns about detection were centered around his plans to kidnap, rape and murder a child.  If this was mere fantasy, never to be fulfilled, then why would Portway need to go to such lengths to conceal evidence from potential law enforcement investigation?

3.    <u>Revisiting the 3553 Factors</u>

Portway has pled guilty to some of the most vile and heinous crimes known to our society, namely participating in the sexual exploitation of young children through the possession and distribution of child pornography and soliciting the kidnapping of a child for the purpose of killing and consuming that child.  The Supreme Court, Congress, and courts across the country have repeatedly recognized the pain and suffering caused by the sexual exploitation of children. Moreover, cannibalism has been recognized as a crime by Western culture since at least the Biblical era and many of our society's most infamous and reviled criminals, such as Jeffrey Dahmer, are so notorious precisely because they were cannibals.  Portway's criminal activities, conducted in concert with others like him, help normalize these thoughts and behaviors among child predators.  They create a forum that feeds such pathologies and justifies them, as well as creating a market that rewards those who are willing to actually carry out such heinous acts. Similarly, Congress has said one of the harms of child pornography is that "it inflames the desires of ... pedophiles ... who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials." *United States v. MacEwan,* 445 F.3d 237, 250 (3d Cir. 2006) (quoting Child Pornography Prevention Act of 1996).  A substantial sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, and to

29

provide just punishment for the offense as well as meet the other factors in § 3553, particularly the protection of the public.

Such a sentence would also comport with the sentences given to others members of this network who have committed similar offenses.  As indicated above, Michael Arnett pled guilty to three counts of producing, distributing, and possessing child pornography and was sentenced to 30 years in prison.[5]  Ex. G32 (J&C).  Ronald Brown pled guilty to eight counts of receiving and distributing child pornography and was sentenced to 20 years, Ex. G34 (J&C), based in part upon his disturbing chats with Portway and Arnett.  Ex. G34 (Gov't Motion for Upward Variance).  Unlike Portway, Brown was neither convicted of soliciting a crime of violence, namely kidnapping a child, nor did he construct a dungeon to carry out his plans.  A sentence of 27 years' incarceration, the high end of the applicable guidelines range, adequately captures the severity of Portway's conduct relative to these offenders.

---

[5] Robert Poe pled guilty to three counts of travelling with the purpose of engaging in a sexual act with a minor and was sentenced to 19 ½ years' incarceration and lifetime supervised release. Ex. G28 (J&C).  Though Poe sexually exploited children, there was no indication that he shared the others' interest in the murder, mutilation and consumption of children.  The remaining targets have not yet been sentenced.

## CONCLUSION

For the reasons stated above, the Government avers that a sentence of 327 months imprisonment, the maximum allowed under the Plea Agreement, along with lifetime supervised release, is a proper disposition of this matter. Such a sentence is sufficient but not greater than necessary to reflect the seriousness of Portway's crime and recognize the danger he poses to the community, especially to young children.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: /s/ *Stacy Dawson Belf*
    Stacy Dawson Belf
    Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2013, I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to Richard J. Sweeney.

/s/ *Stacy Dawson Belf*
Stacy Dawson Belf
Assistant U.S. Attorney