# EXHIBIT A

ERIC L. BROWN, PSY.D.
LICENSED PSYCHOLOGIST
102 LENOX STREET
WEST NEWTON, MA 02465
---
TELEPHONE (617) 527-2417
TELECOPIER (617) 527-2412
Email:  DOCTORELB@gmail.com

September 11, 2013

## Aid-in-Sentencing Evaluation

Name:  Geoffrey Portway
Date of Birth:  04/29/1973
Dates of Evaluation:  10/04/12, 11/01/12, 12/13/12, 1/17/13
Evaluator:  Eric L. Brown, Psy.D.

## I.    Identification:

Geoffrey Portway is a forty year-old single man who lived alone in a condominium which he owned in Worcester until he was arrested in July of 2012 for his current federal offenses.  Mr. Portway was charged with Solicitation to Commit a Crime of Violence, Distribution of Child Pornography, and Possession of Child Pornography.  indicted and detained at the Plymouth County Correctional Facility. Prior to his arrest, Mr. Portway worked full-time for twelve years as a senior computer operator for B.J.'s Wholesale Club in Westborough, MA.   Mr. Portway receives prescribed medications for diabetes gout, hypertension, and depression.

## II.    Reason for Referral:

After Mr. Portway pleaded guilty to the federal offenses listed above, he was referred for an aid-in-sentencing evaluation by his counsel, Richard Sweeney, Esq., to determine the antecedents of his alleged sexual misconduct, to assess his risk for re-offending and the degree of danger he posed to the community.  Since his detainment, Mr. Portway has cooperated with law enforcement and agreed to plead guilty to his offenses.

### III.    Methods of Evaluation:

Psychodiagnostic interviews of Mr. Portway – 12.0 hrs.
Review of records:
Pre-sentencing Investigation Report

### IV.    Disclosure of Non-Confidentiality:

Prior to participating in this evaluation, Mr. Portway was informed that in the event that a report was submitted on his behalf, the content of our conversations and any data gathered through assessment instruments would not be considered confidential nor regarded as privileged information. I explained to Mr. Portway that if my report were used in court, I could be questioned about any matters discussed in our meetings which contributed to the findings and opinions set forth in my report. Mr. Portway was told that his participation was entirely voluntary and that he could choose whether or not he wished to answer particular questions, and that at any point during the interview, he could withdraw from the evaluation. Mr. Portway indicated his understanding of these caveats and agreed to participate in this evaluation according to the parameters which were explained to him.

### V.    Pertinent History:

Mr. Portway was born in Madrid, Spain. His parents were British citizens. His father worked for Westinghouse and, due to his employment, relocated to Pennsylvania, Puerto Rico, and Ireland before moving to Framingham, MA in 1980. Mr. Portway was the second oldest of three children born to his mother and father. His parents separated when he was ten years old after his father's infidelity became evident. After his parents' separation, Mr. Portway's mother worked full-time to make economic ends meet. Because of his mother's work schedule, Mr. Portway and his siblings became responsible for their self-care at an early age. His father remarried for a third time and now lives in Florida as a retired accountant at the age of seventy-five since his second wife died. His mother died in 2012 from a brain aneurysm. He has an older brother who is divorced with two children, and a younger sister who is married with two children.

Mr. Portway has suffered from three head injuries. As a toddler, he fell and struck his head on the curb. He cried for several hours and cannot remember if he lost consciousness. During his childhood, he struck his head

a second time when his brother pulled a chair out as he tried to sit down.  On a third occasion, he fell off a donkey and hit his head on the ground.  He did not lose consciousness from the second and third head injuries.

Mr. Portway had difficulty making friends because he moved to four different countries before he was nine years old.  Mr. Portway recalled that while his sister could make friends in a day or two, he required several months to establish a friendship. From the age of nine, Mr. Portway attended the public school system of Framingham.  Mr. Portway experienced his father as mostly absent until his parents separated.  Thereafter, he and his siblings saw his father with declining frequency on weekends until the contact became monthly.  Mr. Portway stated that his father didn't like children.  Mr. Portway felt loved and supported by his mother.

Mr. Portway described being close to his older brother who lives in Minnesota even though his brother was slow to respond to emails from Mr. Portway.   He had not seen his brother since Christmas of 2011.  His sister lived several towns away in Milford, MA and has two children. Mr. Portway would see his sister and her children approximately monthly.

For as long as he could remember, Mr. Portway's social life was impoverished.  At the age of eight, he realized he was gay when he lived in Ireland and had an intense crush on his best friend, but did not dare to reveal his attraction to him.  At about this same age, he became fascinated with two stories: *Hansel and Gretel* and *In the Night Kitchen*. In the tale of *Hansel and Gretel* by the Brothers' Grim, a brother and sister are captured by a witch, caged and fattened up so that the witch can eat them later. *In the Night Kitchen*, by story-teller and illustrator Maurice Sendak, gives a vividly illustrated narrative of a little boy who dreams of falling through the floor naked into a bowl of batter that is going to be baked into biscuits by cooks who are working in the night kitchen.  From reading these tales, the idea of being eaten became exceedingly desirable and sexually arousing to Mr. Portway when he was eight years old.  As a prepubescent boy, when Mr. Portway fantasized about being eaten, he felt sexually titillated.  He felt compelled to overeat, believing that he would be more desirable for consumption if he were fatter.  He put pillows under his shirt so he could appear plumper when he looked at himself in the mirror.  He fantasized about being eaten, but also began to imagine eating others. He ate compulsively, and by the time he finished high school, he weighed well over three hundred pounds.  On a more unconscious and primitive level, Mr.

Portway's wish to be eaten fulfilled a more basic desire to be wanted, valued, and incorporated by another person.

Mr. Portway stated that since the age of eight or nine, he was attracted to three-to-four year-old boys. As he got older, he became interested in eight-to-twelve year-old prepubescent boys. Throughout high school, Mr. Portway did not disclose his homosexual orientation. As an adult, he has occasionally felt attracted to pubescent males of slim and short stature. In his early twenties, Mr. Portway made a suicide attempt after he told his brother that he was gay, and his brother told his sister and mother. His brother acted in disbelief and tried to convince Mr. Portway that he wasn't gay.

Mr. Portway grew up believing that he was utterly unattractive and undesirable. His father was homophobic and commented derisively and disparagingly about homosexuals. Mr. Portway stated that he has felt attracted to thin, hairless adult males, but deemed himself so unattractive that he abandoned the hope and possibility of having a relationship with another person.

About nine or ten years ago, Mr. Portway began to look at child pornography because it seemed to fulfill a need for excitement and motivation. After discussing his cannibalistic fantasies with a friend, he began searching on-line for chat rooms, and discovered people who would send and trade child pornography. He wanted to acquire images of plump or fat children who were tied up or caged, or depicted in a cooking theme such as sitting in a pot on the stove. Mr. Portway insisted that he was not aroused by violence and human suffering. But, he collected numerous pictures of prepubescent children and adults who were tied up and/or caged. Initially, he chatted and viewed child pornography for up to six hours per day, but then his interest waned. In chat rooms, he role-played cooking someone or being cooked himself. He began to write stories that he submitted to websites which catered to male cannibalism and he received "positive feedback" for his stories.

After Mr. Portway's arrest, the police discovered a room in the basement that he had outfitted with various kinds of restraining apparatus. Mr. Portway stated that he was interested in sadomasochistic relationships but was unable to find a partner through the Internet. He stressed the consensual nature of sadomasochistic activity and underscored the

importance of voluntary participation, and the explicit provisions for stopping the bondage activity if it became undesirable or unbearable for one of the parties. Mr. Portway insisted that he never intended to kidnap, manipulate or dupe anyone into entering the basement.

Mr. Portway has come to realize that because at least six of his acquaintances knew about his cannibal fetish, it was highly likely that he would get caught and be incarcerated if he ever acted on his fetish. The ideas of eating someone versus being eaten by another person were equally appealing. Mr. Portway stated, "If somebody had said that they would eat me, I would have gone in a heartbeat." The prospect of being eaten gave Mr. Portway the feeling of being wanted by somebody. Thinking about being fattened up in a cage appealed to Mr. Portway even though he realized that he would have to die prior to being eaten. He considered being placed in an oven, but realized that he was too big to be cooked there. He imagined that his throat would be slit and then his body would be dismembered, and then cooked and eaten. He accepted these consequences and stated that he was not afraid to die, and had been depressed for most of his life.

Several years ago, Mr. Portway met a person online who expressed an interest in eating Mr. Portway. Mr. Portway made an airplane reservation and flew out of state to Minnesota to rendezvous with the person who planned to eat him. After waiting in vain about six hours for the person to show up, Mr. Portway checked into a motel room and cut his wrists after ingesting a lot of painkillers. He awakened in a bathtub, dialed 911, and was briefly hospitalized.

Mr. Portway did not devote all his free time to deviant activities. He watched TV and played video games. For the last few years, he would play Dungeons and Dragons with a group of friends on Friday evenings. Mr. Portway enjoyed engaging in live action role play (LARP). On several occasions, he attended LARP events. On Wednesdays, he attended a painting class. Generally, he waited for friends or family to invite him to an activity.

He maintained a reclusive lifestyle. He did not ever frequent pools schools, or parks and attempt to troll for children. He avoided malls and bought nearly everything online. Even during his high school years, Mr. Portway did not hang out in malls. Reportedly, Mr. Portway never left his house to look at or stalk children. Except for the camera on his cell phone

and an old Polaroid camera, he did not own or operate any other cameras, and never had any intention of taking pictures of children.

When questioned by this evaluator about whether he would or could act on his cannibal fantasies, Mr. Portway stated that even though he had fantasized and chatted about eating others, he was playing a role that he would not actually fulfill for the following reasons. He would have to have a willing participant because he would not kidnap and coerce anyone for the sake of eating him. He acknowledged that when he has role-played in chats, he has stated that he would eat a person, but in actual life, he did not believe that he would do this. He did not think that he could actually kill a person. He reasoned that he was not a violent person, and had not gotten into a fight his entire adult life.

During his detention at the Plymouth County Correctional Facility, Mr. Portway met another detainee and eventually consummated his first sexual relationship with another person. Mr. Portway overcame his low self-esteem but is now saddened by the fact that this relationship could not continue because he and his friend will not be sentenced to the same prison.

## VI.   Conclusions:

This forty-year year-old man underwent an aid-in-sentencing evaluation to determine the antecedents of his sexual misconduct, to assess his risk for re-offending, the degree of danger he posed to the community, and his prognosis for rehabilitation. This evaluation relied upon information elicited from Mr. Portway through twelve hours of psychodiagnostic interviews, and from information contained in the document referenced in the Methods section of this report.

1)   Mr. Portway has been charged with Solicitation to Commit a Crime of Violence, Distribution of Child Pornography, and Possession of Child Pornography which constitute non-contact sexual offenses. Aside from these charges, his record is spotless. Throughout his adolescence and adulthood, Mr. Portway has never been charged with any other offense. He has never displayed any aggressive behavior. He has never committed a violent act. He has never engaged in any other sexual misconduct. He has not demonstrated a range of sexual deviancy. He has never attempted to groom or stalk a child for sexually deviant purposes.

2) Mr. Portway understands the gravity of his charges and profoundly regrets his actions. Ever since he was charged with Solicitation to Commit a Crime of Violence, Distribution of Child Pornography, and Possession of Child Pornography in July of 2012, Mr. Portway has known that he would face incarceration if he were convicted on these offenses. He acknowledges the depravity of his actions and their impact on children who have been sexually victimized. Mr. Portway deeply regrets the enduring shame and hardship that he has brought upon his extended family.

3) Aside from Mr. Portway's instant charges, he has earned an honest income and worked consistently for the past twelve years. Unlike his own father who did not show any interest in Mr. Portway's childhood, Mr. Portway partook in some of his niece's and nephew's extracurricular activities. In all of these activities, no complaints of sexually inappropriate behavior have ever arisen.

4) Throughout his life, Mr. Portway has never abused alcohol or drugs. He has not demonstrated any proclivity or pattern of turning to alcohol/drugs as a way of mitigating his problems.

5) Mr. Portway's interest in child pornography is inextricably related to his aberrant childhood fantasies of wanting to be eaten as a primitive way of feeling desired, valued, and needed by another person. Mr. Portway is motivated to obtain further psychological understanding of his behavior, and to pursue treatment. He recognizes how detrimental and ultimately destructive it was to lead a compartmentalized life, collecting and exchanging child pornography, while in the majority of his existence for thirty of his forty years, he did not have any interest in child pornography.

6) Mr. Portway realizes that unresolved past events in his life have contributed to his problems today. To facilitate his rehabilitation, Mr. Portway ought participate in long-term, cognitive behavioral psychotherapy in order to learn how to manage his negative emotions of anxiety and depression, and to mitigate his underlying defective self-image.

7) In spite of the personal circumstances that contributed to his illegal behavior, Mr. Portway understands that he violated the law and accepts responsibility for his offenses and the consequence of incarceration. However, by all other measures of his behavior, Mr. Portway has cooperated with the authorities and lived an upright life as a brother to his siblings, as an

uncle to their children, and as a productive member of society. In weighing the range of time for incarceration, the court should consider the totality of Mr. Portway's life and the fact that he is an excellent candidate for rehabilitation.    In the past, Mr. Portway has never received the full complement of treatment that is necessary for resolving his aberrant childhood fantasies and for achieving his psychological rehabilitation. At the age of forty, Mr. Portway is highly motivated to change the negative course of his life if he is granted the opportunity to treat his problems. If he participates in the treatment recommended above, his likelihood for recidivism and the danger that he poses to the community will both be acceptably low.

Respectfully submitted,

Eric L. Brown, Psy.D.*
Clinical and Forensic Psychologist

*This psychologist has conducted 235 risk assessments of individuals who have been charged with or convicted of a sexual offense, and has testified as an Expert in Superior Courts in the Commonwealth of Massachusetts with respect to the issue of sexual dangerousness on more than one hundred occasions. This psychologist has testified more than twenty-five times before the Sex Offender Registry Board about the level of risk a sex offender poses to his community. This psychologist is a member of the Association for the Treatment of Sexual Abusers (ATSA), and has treated sex offenders for the past twenty years as a condition of their court-mandated probation, using a cognitive-behavioral relapse prevention treatment model.