UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GEOFFREY PORTWAY,                       )
                                        )
        Movant,                         )       Civil No._____
                                        )
v.                                      )       Criminal No. 12-cr-40064-TSH
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        Respondent.                     )
_____    )


MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY, 28 U.S.C. § 2255

## I.  History of the Case

1.    Defendant, GEOFFREY PORTWAY, movant, pled guilty on May 6, 2013, to
a three-count Superseding Information charging him with Solicitation to Commit
a Crime of Violence, in violation of 18 U.S.C. § 373 and 18 U.S.C. § 1201; Dis-
tribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2); and
Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).

2.    The Court entered Judgment against movant on all three counts on
September 17, 2013; and sentenced movant to a term of imprisonment of 320 months
on September 23, 2013.

3.    On September 19, 2014, within the one-year limit for a collateral at-
tack pursuant to 28 U.S.C. § 2255, movant filed a cursory Motion pursuant to 28
U.S.C. § 2255; along with a handwritten Motion To Enlarge Time to File Memoran-
dum of Law In Support of 28 U.S.C. § 2255 Motion Under Equitable Tolling, up un-
til December 16, 2014, which this Court granted on October 29, 2014.


## II.  Facts of the Case

-1-

4. Movant came to the attention of law enforcement as a result of an in-national investigation into trafficking, via computer, of child pornography by individuals in various countries.

5. Movant was found to have been "chatting" with other individuals and showed an interest in certain types of child pornography which was found stored in various computers located at movant's residence.

6. Computer Forensics Agents determined that the computer media contained, among other things, at least 58 images of child pornography and numerous images of dead children, as well as chat logs/file transfers from both Yahoo and Skype, that included chats with other individuals with an interest in, among other things, the sexual and physical abuse of children.

7. The chats included the purported planning of the abduction of an actual child for the purpose of raping, killing, and cannibalising of such child.

8. During the execution of the search warrant on movant's residence, a sally port leading to a second door (with a keyed lock) that led to a sound-proof dungeon, containing, among other things, a chair, television, and what appeared to be cable access to the internet. Also in this room were a child-sized home-made coffin (with large speakers covered in wire mesh at one end) with exterior locking devices, and a steel table top (with steel rings at 6 points, presumably for restraints). Outside these rooms were a cabinet freezer, an upright freezer, disposable scalpels, butchering kits, and castration tools.

9. Movant was arrested, in relation to this federal case, on July 27, 2012.

10. For the reasons and matters of law set out in this Memorandum of Points and Authorities, the Motion pursuant to 28 U.S.C. § 2255 should be granted.

A. Congress's power to legislate and enact any criminal law is constrained by the limits set out in Article I, § 8, of the Constitution

11. The Supreme Court, in admonishing the lower federal courts, has contin-

-2-

uously adhered to the principle that:

> "The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution."

Reid v. Covert, 354 U.S. 1, 5-6 (1957)(citations omitted).

12.    With this axiom in mind, the Court has emphasized that "[t]he object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people adopting it." Lake County v. Rollins, 130 U.S. 662, 670 (1889). Therefore, "[t]he simplest and most obvious interpretation of [the] [C]onstitution, if in itself sensible, is the most likely to be that meant by the people in its adoption." Id., 130 U.S., 671 (emphasis added).

13.    Chief Justice Marshall, in McCulloch v. Maryland, 4 Wheat. 316 (1819), established the clear and unambiguous finding that,

> "with respect to the whole penal code of the United States: Whence arises the power to punish in cases not prescribed by the Constitution? ... Congress is empowered "to provide for the punishment of counterfeiting the securities and current coin of the United States," and "to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations." The several powers of Congress may exist, in a very imperfect state, to be sure, but they may exist and be carried into execution, although no punishment should be inflicted in cases where the right [or power] to punish is not expressly given [in the Constitution]."

Id., 4 Wheat., at 416-17 (1819)(emphasis added).

14.    In giving credence to the "Father of the Constitution," the Court, in continuing such principles of a limited Federal Government, put it thus:

> "The Constitution created a Federal Government of limited powers. ... As James Madison put it:
>
> "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite. ..." The Federalist No. 45, pp. 292-293 ..."

Gregory v. Ashcroft, 501 U.S. 452, 457-58 (1991)(citations omitted).

See also National Federation of Independent Bus. v. Sebelius, 132 S.Ct. 2566 (Sebelius), 2577-78 (2012)(same).

15.     Noting that Congress's "police power" over criminal offenses are so limited, as Chief Justice Marshall stated, to only those in Article I, § 8, that expressly provide, as the Framers drafted therein, for punishment or to define and punish thereunder, even Justice Thomas, in United States v. Lopez, 514 U.S. 549 (1995), similarly found:

> "It is worth noting that Congress, in the first federal criminal Act, did not establish nationwide prohibitions against murder and the like. ... To be sure, Congress outlawed murder, manslaughter, maiming, and larceny, but only when those acts were either committed on United States territory not part of a State or on the high seas. ... When Congress did enact nationwide criminal laws, it acted pursuant to direct grants of authority found in the Constitution. ... Notwithstanding any substantial effects that murder, kidnapping, ... gun possession [, or such crimes as are the subject of this case] might have ... on interstate commerce, Congress understood that it could not establish nationwide prohibitions."

Id., 514 U.S., at 596-97 n. 6 (1995)(Thomas, J., concurring)(emphasis added)(citations omitted).

16.     That is why "Federal laws "made in Pursuance" of the Constitution must comply with ... structural limitations in the Constitution [to] ensure that the Federal Government does not amass too much power at the expense of the States[,]" Wyeth v. Levine, 173 L.Ed.2d 51, 73 (2009)(Thomas, J., concurring), demonstrating that no other conduct may be made criminal under federal law, other than those expressly enumerated in clauses 6 and 10 of Article I, Section 8 of the Constitution, making any other purported federal criminal laws not "made in Pursuance" of the Constitution and subject to be stricken down.

17.     What must be considered, also, is the fact that when the different States were considering the extent of the "judicial Power" of the federal courts, Samuel Bryan could not have said it clearer:

> "That the judicial power of the United States shall be confined to cases affecting ambassadors, other public ministers and consuls; to cases of admiralty and maritime jurisdiction [think piracies and felonies on the high Seas]; and in criminal cases, to such only as are expressly enumerated in the constitution, ..."

-4-

Pennsylvania Minority Proposal, Samuel Bryan, December 18, 1787(emphasis added).

18.   Because the instant charged offenses are not "expressly enumerated"
in the Constitution, not only is Congress precluded from legislating over such
conduct it is constitutionally prohibited from enacting any laws defining and
punishing such conduct, such conduct left to the State to define and punish under
its laws and in its courts.

19.   As the Court found:

"The laws of Congress ... do not extend into the territorial limits of
the states, but have force only in the District of Columbia, and other
places that are within the exclusive jurisdiction of the national govern-
ment."

Caha v. United States, 152 U.S. 211, 215 (1894).

20.   Also:

"To bring [an] offense within the jurisdiction of the courts of the
Union, it must have been committed ..., out of the jurisdiction of any
state. ... It is not the offense committed, but [the place] in which it
is committed which must be out of the jurisdiction of the state."

United States v. Bevans, 3 Wheat. 336, 387-88 (1818).

21.   Since the instant offense has been shown to have been committed within
the State of Massachusetts, and out of the territorial (enclave) jurisdiction
of the Federal Government, and the offense conduct not to be one that is expressly
enumerated in the Constitution to give Congress power to legislate thereunder, the
following must be taken into account that shows Congress is without power to enact
the purported federal crimnal laws charged in this case:

"The enumeration of powers is also a limitation of powers, because "[t]he
enumeration presupposes something not enumerated." ... The Constitution's
express conferral of some powers makes clear that it does not grant others. ...
"If no enumerated power authorizes Congress to pass a certain law, that
law may not be enacted, ..."

Sebelius, 132 S.Ct., at 2578 (citations omitted).

22.   Therefore, for the foregoing reasons alone, since Congress's legisla-
tive powers, under Article I, § 8, are so limited as to not permit legislation

-5-

and enactment of the federal criminal laws charged in this case against movant, and case law demonstrates that only those in clauses 6 and 10, which contain express language to punish thereunder, are the sole and total "whole penal code of the United States," McCulloch, supra, this Court was want of both personal and subject-matter jurisdiction of the case and person of movant, and requires reversal of the convictions and dismissal of the Indictment/Information in this case, with prejudice.

B.    The Commerce Clause does not permit legislation to define and/or punish thereunder

23.    Strictly construing the provisions of the Constitution, especially the Commerce Clause, demonstrates that the lack of language in the Clause to empower Congress to legislate and enact punishments against an individual can be readily discerned, once the history behind the Clause is presented, as it will be in this part of the discussion, where James Madison explained the reason for including the Commerce Clause in the Constitution, thus:

"A very material object of this [commerce] power was the relief of the States which import and export through other States from the improper contributions levied on them by the latter. Were these at liberty to regulate the trade between State and State, it must be foreseen that ways would be found out to load the articles of import and export, during the passage through their jurisdiction, with duties which would fall on the makers of the latter and the consumers of the former. We may be assured by past experience that such a practice would be introduced by future contrivances; and both by that and a common knowledge of human affairs that it would nourish unceasing animosities, and not improbably terminate in serious interruptions of the public tranquility. To those who do not view the question through the medium of passion or of interest, the desire of the commercial States to collect, in any form, an indirect revenue from their uncommercial neighbors must appear not less impolitic than it is unfair; since it would stimulate the injured party by resentment as well as interest to resort to less convinient channels for their foreign trade."

Federalist No. 42, James Madison (The Federalist Papers, 2009, American Bar Association Publ.)(emphasis added).

24.    Even Joseph Story expressed the same sentiment, observing:

-6-

"The want of this power to regulate commerce was, as has been already suggested, a leading defect of the Confederation. In the different States, the most opposite and conflicting regulations existed; each pursued its own real or supposed local interests; each was jealous of the rivalry of its neighbors; and each was successively driven to retaliatory measures, in order to satisfy public clamor, or to alleviate private distress. In the end, however, all their measures became utterly nugatory, or mischievous, engendering mutual hostilities, and prostrating all their commerce at the feet of foreign nations. It is hardly possible to exaggerate the oppressed and degraded state of domestic commerce, manufactures, and agriculture, at the time of the adoption of the Constitution. Our ships were almost driven from the ocean; our work-shops were nearly deserted; our mechanics were in a starving condition; and our agriculture was sunk to the lowest ebb. These were the natural results of the inability of the General Government to regulate commerce, so as to prevent the injurious monopolies and exclusions of foreign nations, and the conflicting, and often ruinous regulations of the different States. If duties were laid by one State, they were rendered ineffectual by the opposite policy of another. If one State gave a preference to its own ships or commerce, it was counteracted by another. If one State endeavored to foster its own manufactures by any measures of protection, that made it an object of jealosy to others; and brought upon it the severe retaliation of foreign governments. If one State was peculiarly favored in its agricultural products, that constituted an inducement with others to load them with some restrictions, which should redress the inequality. It was easy to foresee, that this state of things could not long exist, without bringing on a border warfare, and a deep-rooted hatred, among neighboring States, fatal to the Union, and, of course, fatal also to the liberty of every member of it.

"The power "to regulate foreign commerce," enabled the government at once to place the whole country upon an equality with foreign nations; to compel them to abandon their narrow and selfish policy towards us; and to protect our own commercial interests against their injurious competitions. The power to regulate commerce "among the several States," in like manner, annihilated the cause of domestic feuds and rivalries. It compelled every State to regard the interests of each, as the interests of all; and thus diffused over all the blessings of a free, active, and rapid exchange of commodities, upon the footing of perfect equality."

A Familiar Exposition of the Constitution of the United States, Ch. XVI, §§ 163-164, Joseph Story, LL.D., 1859, Harper & Brothers, Publ. (reprinted by Regnery Gateway, Inc., 1986, pp. 140-41).

24.    Rather than reaching the conduct of individuals, the Commerce Clause was included to prevent the conduct of the several States, as the Supreme Court made clear, as a means

"of preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would if it were free to place burdens on the flow of commerce across its borders that commerce

wholly within those borders would not bear. The provision thus "'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"'

Oklahoma Tax Commission v. Jefferson Lines, Inc., 514 U.S. 175, 179-80 (1995)(citations omitted).

25.    It then, therefore, could reasonably be said the whole, and only, purpose of the Clause was to promote, and not restrict, the flow of commerce through the several States without any impediments from those States by imposing taxes, duties, and imposts on neighboring States for the use of the first States' roads and highways for the transportation of goods and commodities coming from either foreign sources or another State beyond the State for which such roads are used for such transportation; and not to provide for the punishment of, or to define and punish, any conduct by private individuals, since the Clause nowhere has such language in its drafting, and much less in its history for its inclusion in the Constitution.

26.    Justice Thomas pointed out clearly:

"The Constitution not only uses the word "commerce" in a narrower sense than our case law might suggest, it also does not support the proposition that Congress has authority over all activities that "substantially affect" interstate commerce. The Commerce Clause does not state that Congress may "regulate matters that substantially affect commerce with foreign Nations, and among the several States, and with the Indian Tribes." ... Clearly, the Framers could have have drafted a Constitution that contained a "substantially affects interstate commerce" Clause had that been their objective."

United States v. Lopez, 514 U.S. 549, 587-88 (1995)(Thomas, J., concurring).

27.    But that was not their intention or objective to do so on the premise that the "police power is controlled by 50 different States instead of one national sovereign," National Federation of Independent Business v. Sebelius, 132 S.Ct. 2566 (Sebelius), 2578 (2012)(citing The Federalist No. 45, at 293 (J. Madison)), and, as Justice Thomas warned:

-8-

"Apart from its recent vintage and its corresponding lack of any ground-
ing in the original understanding of the Constitution, the substantial ef-
fects test suffers from the further flaw that it appears to grant Congress
a police power over the Nation."

Lopez, 514 U.S., at 599-600 (1995)(Thomas, J. concurring).

28.    Justice Thomas, after citing relevant cases, pointed out:

"These cases all establish a simple point: From the time of the ratifi-
cation of the Constitution to the mid-1930's, it was widely understood that
the Constitution granted Congress only limited powers, notwithstanding the
Commerce Clause. ...
"If we wish to be true to a Constitution that does not cede a police
power to the Federal Government, our Commerce Clause's boundaries simply
cannot be "defined" as being "'commensurate with the national needs'" or
self-consciously intended to let the Federal Government "'defend itself
against economic forces that Congress decrees inimical or destructive of
the national economy.'" ... Such a formulation of federal power is no test
at all: It is a blank check.
"At an appropriate juncture, I think we must modify our Commerce Clause
jurisprudence."

Lopez, 514 U.S., at 599 and 602 (1995)(in relevant part)(Thomas, J., concurring).

And that juncture is before this Court with this collateral motion to correct a

de facto unconstitutional conviction for conduct Congress is precluded from legis-

lating over, by the express limits that the Framers placed on the Feceral Govern-

ment, which by enumerating those limits "makes clear that it does not grant others."

Sebelius, supra, 132 S.Ct., at 2578 (2012).

29.    Just as "[w]here Congress uses certain language ..., it is generally

presumed that Congress acts intentionally," Sebelius, 132 S.Ct., at 2583 (citation

omitted), the language the Framers used in drafting the Commerce Clause, carrying

more weight than an ordinary act of Congress, establishes that a certain line has

been drawn in stone, especially where the purpose of the Clause has been demon-

strated not to reach conduct such as that charged against movant, the alleged of-

fense conduct being reserved for the States to define and punish under its own

laws and in its courts—not the Federal Government that is limited to only those

clauses that contain expressive language to "define and punish" or "provide for

-9-

the punishment of" the conduct described therein: Article I, Section 8, clauses 6 and 10, the other clauses, and especially the Commerce Clause, notwithstanding.

30.    It all comes down to the fact that this Court, having to notice the issues and claims raised herein, must "safeguard" the "constitutional rights" of movant, Burt v. Titlow, 134 S.Ct. 10, 15 (2013), on the premise that "this Court [] is bound by and swears an oath to uphold the Constitution," Public Citizen v. Dept. of Justice, 491 U.S. 440, 466 (1989)(citation omitted), and entails such protection of movant's rights to examine this Court's subject-matter jurisdiction over the underlying charged criminal offense—an offense Congress is precluded from enacting into federal criminal law, such offense left to the States, exclu-. sively, thus if the offense is not one for the Federal Government to legislate over and enact into federal law, this Court lacks subject-matter jurisdiction and requires the reversal of the null and void conviction and dismissal of the underlying purported federal case with prejudice, on the premise this Court's oath does not provide otherwise.

31.    Afterall, as Chief Justice Marshall admonished:

'Why other wise does [the Constitution] direct the judges to take an oath to support it? This oath certainly applies in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used as the instruments, and the knowing instruments, for violating what they swear to support! ...
"Why does a judge swear to discharge his duties agreeably to the constitution of the United States, if that constitution forms no rule for his government? if it is closed upon him, and cannot be inspected by him?
"If such be the real state of things, this is worse than solemn mockery. To prescribe, or to take this oath, becomes equally a crime. ...
"Thus, the particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void; and that courts, as well as other departments, are bound by that instrument. "The rule must be discharged."

Marbury v. Madison, 1 Cranch 137, 180 (1803).

32.    Thus, "constitutional lines are the price of constitutional government," Zelman v. Simmons-Harris, 536 U.S. 639, 686 (2002)(Souter, J., with whom

-10-

Stevens, Ginsburg, and Breyer, JJ. join, dissenting)(citations and quotation marks omitted).

33.    With the demonstration, in this first-impression type of case, that Congress, under the strict limits of the Constitution, is prohibited the power to legislate over and enact the laws that movant was charged with and prosecuted for in this Court, the convictions "resting on" want of both constitutional power and subject-matter jurisdiction "cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of" the fundamental and paramount "law," McNabb v. United States, 318 U.S. 332, 345 (1943), where for a court to exercise jurisdiction not given by the Constitution, where Congress is shown to lack power to enact the laws charged in a given case, is "treason to the Constitution." New Orleans Public Service v. New Orleans, 491 U.S. 350, 358-59 (1998)(citation omitted).

34.    Applying the rationale of the Supreme Court, when construing the Constitution, it would appear that the federal courts, including the Supreme Court, has lost sight of the principle that

"[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition."

United States v. Sprague, 282 U.S. 716, 731 (1931).

35.    Since the Framers were predominently lawyers, the same can be said of them that applied and was said of the Drafters of the Declaration of Independence being described as

"great men—high in literary acquirements—high in their sense of honor, and incapable of asserting principles inconsistent with those on which they were acting. They perfectly understood the meaning of the language they used, and how it would be understood by others. ... they spoke and acted according to the then established doctrines and principles, and in the ordinary language of the day, and no one misunderstood them."

Dred Scott v. Sandford, 19 How. 393, 410 (1857).

36.    The Supreme Court almost had it right, but missed the point in its

opinion in Sebelius, supra, by reaching non-constitutional issues to settle the

case, as it did in Bond v. United States, 134 S.Ct. 2077 (2014), when it stated:

"Given its expansive scope, it is no surprise that Congress has employed
the commerce power in a wide variety of ways to address the pressing needs
of the time. But Congress has never attempted to rely on that power to
compel individuals not engaged in commerce to purchase an unwannted pro-
duct.  Legislative novelty is not necessarily fatal; there is a first time
for everything. But sometimes "the most telling indication of [a] severe
constitutional problem ... is the lack of historical precedent" for Con-
gress's action. ...

"The power to regulate commerce presupposes the existence of commercial
activity to be regulated. If the power to "regulate" something included
the power to create it, many of the provisions in the Constitution would
be superfluous. ... The language of the Constitution reflects the natural
understanding that the power to regulate assumes there is already something
to be regulated."

Sebelius, 132 S.Ct., at 2587 (2012)(citations omitted).

37.    By the same token, therefore, "[if] the power to "regulate" something

included the power to" restrict conduct by an individual person, the Framers

would not have used the language they incorporated to reach conduct "among the

several States," as the "historical precedent" demonstrates that the Clause was

expressly drafted to reach the conduct of the several States to "prevent[ ]" them

"from retreating into economic isolation or jeopardizing the welfare of the Na-

tion as a whole, ..." Oklahoma Tax, supra, 514 U.S., at 179-80 (1995)—not the

conduct omitted or committed by an individual at all.

38.    The "wrong turn" referred to by Justice Thomas in Lopez in the 1930's

was to commit one of the most outrageous unconstitutional acts a court can commit

from the bench—enlarge the power of Congress under the Commerce Clause by legis-

lating from the Bench, and violated the principles of the Seperation of Powers

Doctrine the Framers instilled in the Constitution, since "[i]n the absence of a

properly passed constitutional amendment," U.S. Term Limits, Inc. v. Thornton,

514 U.S. 779, 838 (1995), by the people, altering the entire Commerce Clause to

-12-

permit Congress to reach matters that "substantially affect interstate commerce among the several States or by the persons therein," the Clause, in its present unadulterated state reaches only the conduct of the several States, to prevent what the great expounders of the Constitution, and the Supreme Court, have admonished the Commerce Clause was included in the Constitution for.

39.   Justice Ginsburg, in her dissent, correctly pointed out:

"The Commerce Clause, it is widely acknowleged, 'was the Framers' response to the central problem that gave rise to the Constitution itself." ... Under the Articles of Confederation, the Constitution's precursor, the regulation of commerce was left to the States. This scheme proved unworkable, because the individual States, understandably focused on their own economic interests, often failed to take actions critical to the success of the Nation as a whole. ...
"Alexander Hamilton described it this way: "[Often] it would be beneficial to all the states to encourage, or suppress[,] a particular branch of trade, while it would be detrimental ... to attempt it without the concurrence of the rest."
"What was needed was a "national Government ... armed with a positive & compleat authority in all cases where uniform measures are necessary." ... The Framers' solution was the Commerce Clause, which, as they preceived it, granted Congress the authority to enact economic legislation "in all Cases for the general Interests of the Union, and also in those Cases to which the States are seperately incompentent."

Sebelius, 132 S.Ct., at 2615 (2012)(Ginsburg, J., dissenting)(citations omitted).

40.   The majority, however, referring to the Framers' use of the word "regulate" in the Clause, gave it the "[f]ar more commonly" used definition: ""[t]o regulate" ... "[t]o adjust by rule or method," which presupposes something to adjust[,]" id., 132 S.Ct., at 2586 n. 4, and, in the context recognized in the day, meant commercial transactions already being conducted. Or, as was said: "The language of the Constitution reflects the natural understanding that the power to regulate assumes there is already something to be regulated." Id. Not to restrict.

41.   In short, the Clause was included to promote the flow of commerce, without the interference of the several States attempting to impose on its neighboring States restrictions in the form of imposts, duties, and taxes for the use

-13-

of the first States' roads for such transportation of such goods to the other
States dependent of the first States' facility roads and highways. And, natur-
ally, allows the several States, which are seperately competent, to define and
punish the transportation of goods that would be considered illegal to so trans-
port in commerce, since the Constitution does not provide for such express power
on the Federal Government.

C.   The Necessary and Proper Clause is inapplicable

42.   Again, relying on Sebelius, supra, the Government cannot rely on the
Necessary and Proper Clause for the proposition that it may be used to enact any
criminal statute Congress wishes to enact, simply, as the Court has reiterated:

"As our jurisprudence under the Necessary and Proper Clause has de-
veloped, we have been very deferential to Congress's determination that a
regulation is "necessary." We have thus upheld laws that are "'convenient,
or useful' or 'conducive' to the authority's 'beneficial exercise.'" ...
But we have also carried out our responsibility to declare unconstitutional
those laws that undermine the structure of government established by the
Constitution. Such laws, which are not "consist[ent] with the letter and
spirit of the constitution," ... are "proper [means] for carrying into Exe-
cution" Congress's enumerated powers. Rather, they are, "in the words of
The Federalist, 'merely acts of usurpation' which 'deserve to be treated as
such.'"

Sebelius, 132 S.Ct., at 2591-92 (2012)(citations omitted).

43.   With the foregoing demonstration that the only conduct Congress has
power to enact criminal legislation over—that is, to either "provide for the
Punishment of" or to "define and punish"—which only clauses 6 and 10 of Article
I, Section 8 contain such express language, the other clauses, especially the Com-
merce Clause, notwithstanding, this Court was, and is, without subject-matter jur-
isdiction over any conduct the Constitution, by its express enumeration, thus the
limits, of the powers therein, therefore, precludes the legislation over, thus to
enact such criminal statutes such as are charged in this case, on the principle
that:

-14-

"Even jurisdiction over the person (as opposed to subject-matter juris-
diction) "is 'an essential element of the jurisdiction of a district ...
court,' without which the court is powerless to proceed to an adjudication.'""

Vermont ANR v. U.S. ex rel. Stevens, 529 U.S. 765, 778-79 (2000)(citations omit-
ted).

44.    And, as has been shown, the Commerce Clause, in its strict construction
and historical evidence thereof, has always been directed to the States' conduct—
not persons—, this Court was want of both personal and subject-matter jurisdic-
tion over the underlying purported federal criminal case, and requires reversal
of the convictions and dismissal of the Information with prejudice.

45.    Afterall:

"The judgment of conviction pronounced by a court without jurisdiction
is void, and one imprisoned thereunder may obtain release by habeas corpus.
A judge of the United States—to whom a petition for habeas corpus is ad-
dressed—should be alert to examine 'the facts for himself when if true as
alleged they make the trial absolutely void.'"

Johnson v. Zerbst, 304 U.S. 458, 468 (1938)(citations omitted).

### CONCLUSION AND PRAYER

46.    With foregoing demonstrating the truths regarding the limits of the
Federal Government, thus Congress, not having power to enact such legislation as
the statutory offenses for which movant was charged and convicted under in this
Court, the relief sought in this cause of action should in all respects be GRANTED.

Dated: ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ , 2014.

Respectfully submitted,

GEOFFREY PORTWAY, Movant pro se, # 94627-038
United States Penitentiary
P.O. Box 24550
Tucson, AZ 85734

-15-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing MEMORANDUM OF POINTS AND AUTHOR-
TIES IN SUPPORT of the 28 U.S.C. § Motion, already tendered in this Court, was
served by first class mail, on this _____ day of December, 2014, on the counsel
for the Government at: Stacy Dawson Belf, Assistant U.S. Attorney, 1 Courthouse
Way, Suite 9200, Boston, MA 02210.

GEOFFREY PORTWAY, Movant pro se

-16-